The next case is Atlantica Holdings v. BTA Bank. Atlantica Holdings v. BTA Bank May it please the Court, Martin Bloor from Cosno-Connor on behalf of the appellants. This case is not your typical fraud-on-the-market, securities-drop-class action. It involves thinly traded and newly issued debt instruments of a restructured Kazakh bank. The facts are complex, the records voluminous, but at the end of the day, the District Court's errors warranting reversal are straightforward. The Court simply ignores the summary judgment standard and engages in a fact-finding exercise. And in doing so, the Court makes two astonishing findings. First, the Court says that the SK deposits were actually beneficial to the bank. And second, that the interest expense associated with those deposits is irrelevant. Now both of these findings turn the concept of accrual counting on its head. I'm sorry, you said the interest rate is irrelevant? Correct. Go ahead. Both of these findings turn the concept of accrual counting on its head and are contrary to the evidence in the record. And based on these plainly erroneous findings, the Court finds that the impact of the SK deposits would occur sometime in the future. Now these findings permeate the Court's entire opinion. The evidence in the record demonstrates that rather than being beneficial, the SK deposits resulted in the bank being insolvent and having negative equity on day one. And the bank reaching its capital adequacy ratios on day one, not sometime in the future. This fact is confirmed by BTA's financial statements, which show it was insolvent for all five quarters between the first and the second restructuring. The record also demonstrates that BTA knew that if it went forward with the SK deposits, these events would occur. Why isn't it a problem for your position that the complaint does not plead the existence of the SK deposit as a material omission? So the complaint pleads that what we term the negative carry swap was detrimental to the bank. And so the issue has always been, you know, whether these transactions that were undertaken were the cause of the, you know, ultimately the restructuring. The SK deposit was an undisclosed portion of that and actually didn't come out until this litigation began. But certainly the defendants were on notice that the theory was that the negative carry swap was the cause. But given the heightened pleading standard, I mean, the need to identify material misrepresentations or material omissions pursuant to that standard, does the complaint do that? Because I really didn't, it definitely references the SK deposits and their potential effects, but not that the omission to disclose is a problem. Well, the negative carry swap, if you look at it, the SK deposits are an integral part of that. And so, you know, certainly the district court sustained it on a motion to dismiss. They said the pleadings were adequate. And really, there's nothing new about our theory. It's just that we provide more detail as discovery came out in terms of all of the legs of the transaction that were undisclosed. But the defendants were always on notice that the theory was that the negative carry swap was part of the major omissions or major material misrepresentations and omissions that were the basis of our claim. I want to focus the court on the viability misstatements, if I can. So the 2010 information memorandum, BTA stated that it believed that the restructuring would allow the bank to continue as a going concern. The court found that this was not both objectively and subjectively false. But the court was wrong on both points. The court undertook a going concern analysis using U.S. GAAP, when, in fact, the bank's financials were prepared under the IFRS. And the court's going concern analysis, again, centered on this notion that the SK deposits were beneficial to the bank. The court actually concludes, and I quote, this additional cash makes it more likely that the corporation would continue as a going concern. But what the court fails to consider is that there are other factors besides cash flow that are relevant to the going concern analysis. What do we make of the fact, though, that it did continue to be a going concern for several years after this, after the 2010 statement? Is that irrelevant? Well, no, Your Honor. I believe that, first of all, we disagree with the district court that, and the district court holds that it remained a going concern until it merged with Commerzbank in 2014. The simple fact of the matter is that it had to go into another restructuring to spot borders after the first restructuring. So in terms of it continuing as a going concern, it actually wasn't able to without another restructuring. The restructuring, though, are you saying a restructuring means that it no longer qualifies as a going concern? Well, what I'm saying is that the, certainly, when you look at all the factors that go into the going concern analysis, which include also compliance with capital adequacy ratios and the amount of its liability, when you look at all of those things and you also consider the testimony of the chief restructuring officer of the bank, which said going concern and capital adequacy go hand in hand, certainly, it would not have continued as a going concern but for that second restructuring. So I don't think it's fair to say that it continued all the way until, you know, after our second restructuring. And second, I think these are issues of fact that the court below shouldn't have resolved in the context of a summary judgment motion. You know, they're competing, certainly, our expert witness put forward evidence that from day one, the bank breached its capital adequacy ratios. From day one, the bank was insolvent and the bank's own financial statements show that it was insolvent for that entire time period. I'd like to just briefly touch, because my time is short, on loss causation. And the district court's loss causation analysis is also based on this notion that any impact to the bank from the S.K. deposits wouldn't occur until the future. And that conclusion is the exact opposite of the two experts that the appellants had in this case, both of whom concluded that there was an impact from day one. And there's at least an issue of fact that this district court should not have resolved. The record supports that the concealed risk materialized when the news of the negative carry swap began to trickle into the market in May of 2011. And again, this is not your typical stop drop case. So certainly by December of 2011, when the second restructuring was answered, the risk materialized. And the record demonstrates that the very facts misrepresented and omitted, the S.K. deposit omission, the misstatements regarding going concern and capital adequacy, were all substantial factors in the appellant's economic loss. The court also invaded the province of the jury in weighing the evidence and concluding that factors other than the S.K. deposit caused the 2012 restructure. It is plain that the court's opinion below that it resolved facts and weighed evidence improperly under summary judgment motion, the court disregarded expert and other evidence and supplanted its own judgment in a way that was inconsistent with the relevant international bank finance and accounting rules. And for all these reasons, we ask that the court vacate the decision below and remand the case for further proceedings. Thank you. May it please the court, my name is Jason Vigna, I'm an attorney from Mintz Levin representing Appellee BTA Bank. My colleague Jonathan Walsh from Curtis Millet represents S.K. if you have any questions specifically to that. I'd like to start with the undisputed facts that are in the record. And what the court did here was exactly what courts are directed to do in Anderson and Matsushita, look at the undisputed facts and see if there really are any issues for a reasonable jury to consider. And here there were none. And most of the courts Oh, excuse me. I think here the most important undisputed facts were actually undisputed facts proposed by the plaintiffs. Those are numbers 28 and 29 at page A6704. Mr. Bloor is talking about the accrual of the interest on this deposit. The plaintiffs themselves, however, recognize that the amount that was accrued on this deposit before BTA defaulted on its bonds the second time and had to enter into a second restructuring was 25.5 billion Kazak tenge, which is about 25, excuse me, 25.5 billion U.S. dollars. That's in the context of a bank that at that point had negative equity of 5 billion U.S. dollars and was about to have negative equity of 10 billion U.S. dollars once the RUs were accelerated. Even if we were to take Mr. Bloor at his face that the district court wasn't properly considering accrual accounting, the deposit was 3.5% of the whole. On the undisputed facts, and of course the deposit, that interest wasn't all new interest. It was interest that was accruing at 11%, but the appellants have said that that interest rate was too high. Never explained how high that really should be, but the appellants have admitted that previously the bank or, excuse me, previously Fund SK was accruing interest at 8.4% on its deposits, which appears at undisputed fact 178 at A6588. So what we're really looking at is the difference between 8.4% and 11%. It's about $40 million is the additional interest based on the undisputed facts. The district court was absolutely right that there is no evidence that the SK deposit caused the bankruptcy, the second bankruptcy of BTA. The evidence is very clear that it was related to non-performing loans. But, of course, the Court doesn't really need to get there. This is really, I think, a loss causation case. Mr. Bloor pointed out that the district court made a realization of risk determination, that there hadn't been a realization of risk. That was only half of the Court's determination. Of course, the Court also determined that the plaintiffs had not tried to disaggregate any losses as required by Dura. And this is not a debatable point. In Dr. Heretzay's report, their damages expert, he specifically said that what he was doing was estimating damages as the purchase or acquisition price of securities less the price of the securities adjusted for the true financial condition of the bank. And that's at A3243. This is exactly what the U.S. Supreme Court said in Dura is not sufficient to plead loss causation. That used to be the old Ninth Circuit standard. The Supreme Court said that is not accurate. And, of course, this Court has reiterated that many, many times. And dismissal really should be affirmed here, because the appellants did not even attempt to show, even in a rough way, which is a word that appears in some of the cases, that proximately caused damages by presenting evidence that the bond's price declines were caused by the revelation of any supposedly concealed facts, as opposed to using the words of Dura, changed economic circumstances, changed investor expectations, or other new industry-specific or firm-specific facts, conditions, or other events. Here, the record was replete with all of those things that the Supreme Court pointed out. There was kind of a disaster at the bank. There was definitely disaster in Kazakhstan. Bond prices for all of Kazakhstan's banks were collapsing at the time. BTA was doing worse than the average bank. I think that the appellants highlighted in their brief that loans made by BTA decreased 24% in a very, very, very short time between the restructuring and the first time financial statements came out. If your loans are coming out, like, decreasing that much, you're just not getting the revenue in. And also, if you look, the record is crystal clear that non-performing loans were increasing at a radical rate. The economy was bad. BTA wasn't doing well. It was incumbent on these appellants to try to disaggregate, at least in a rough way, what effect all of that actually had on the bond prices. And if you actually look at when the bond prices were decreasing, it's pretty much in tandem with a lot of these negative effects. This was 100% their obligation. They did not meet it. It cannot be delegated to anybody else. This case should be affirmed on loss causation grounds. This case also can and should be affirmed on the ground that actually several observers have made to us, such as, why is this case the United States at all? And it's a very good question when you're dealing with Panamanian plaintiffs in expressly offshore transactions, buying bonds that were cleared and settled offshore by a foreign issuer governed by foreign law. And of course, the issuer had no involvement in these foreign transactions. And especially after Covello, where this court said that providing a domestic forum ought to enhance confidence in U.S. securities markets to protect U.S. investors, here it would do neither. That observation applies equally here. This is a case that has nothing to do with the United States other than the use of a broker, who, by the way, was in an international account, and they were brokering bonds that continued to be held in Brussels. Has nothing to do with the United States. But even stepping back, there's not even a domestic transaction here. And it's really not disputed in the record at all. Both sides— There's the involvement of UBS, I suppose. But this is not an issue that the district court reached. And we don't need to reach it either if we agree with the district court on either of the other issues. Yes, I wanted to, of course, provide an easy off-ramp because many, many, many people have observed that this is a case that really doesn't belong here. So I did want to point out kind of a wrinkle that the district court had dealt with in one of its earlier decisions on this. It wasn't until we had some experts looking at the trade confirmations that we realized that in all but perhaps one or two instances, UBS was actually a principal in the transaction. They went out, they got bonds from European banks, got the bonds and then sold them to the plaintiffs. And when it did that, you have to look at where was the meeting of minds for that second purchase. And everybody agrees that that meeting of minds happens when there is an agreement on the amount and the price. And that is when UBS called up Mr. Camus and said, OK, we found some bonds. Do you want to buy them at this particular price? And often he said yes. Sometimes he said he said no. It's that moment when he says yes, that the meeting of minds occurs. And an absolute activist, this court said that that moment of agreement actually also shows the locus of the agreement, to use the court's language. And the locus of the agreement was always in Chile. Now, of course, there are, you know, the district court was right, or actually this court was absolutely right, Judge Livingston, pointing out that this case, this omission point, it never survived the scrutiny that was required under the PSLRA. And it's a very different situation from the case that was cited by the appellant saying you just have to put the parties on notice. And I think at least two of the members of this panel have written decisions on the PSLRA before and recognize the heightened pleading standards that exist there. But as a relatively experienced attorney in this area, I think I can say with a fair amount of confidence, if this allegation had been made, it would not have survived a motion to dismiss because the deposit had actually been disclosed by Fund SK before any bond purchases were made. It kind of eliminates the enter, probably eliminates the fact that there was any sort of a misrepresentation or omission at all, really gets to a lot of the elements. But the point is, the supposedly undisclosed deposit, it never had an opportunity to be tested in the district court as required by the PSLRA, and it was raised for the first time on appeal. The reference to a deposit that was made in the complaint was the $245 billion 10-gallon deposits that had already existed by Fund SK at the bank. And the SK disclosure, that's the 2009 financial statement? That's exactly right, Your Honor. And so this new omission theory, which really appeared for the first time in summary judgments improperly in our view, it really hasn't been preserved for review. So that's another reason why this Court can and should affirm dismissal in this case. Happy to answer any other questions. Thank you. Thank you. I just want to touch on a few points. So first, in terms of the SK deposit itself. So this deposit was not, as the appellees try to paint it as, this normal deposit. At the end of the day, the amount of interest that would be paid on this over the term amounted to 25 percent of the assets of the bank. And as a result of that, it actually required the board to approve the transaction. And the board actually eventually had to do that. And the interest rate on these deposits were 11 percent, which was higher than the projected interest rate for all the other term deposits in the Lazard model, which were the range between 6.7 and 10.6 percent. And the weighted average, when you actually included these, brought it down to 7.5 to 9.7 percent. And as our expert pointed out in his report, the benchmark in Kazakhstan at that time was 2 to 4 percent for individuals and 6 to 8 percent for corporations. Actually, I think I flipped that. But the point is, to the extent we're arguing about the interest rates and whether they were high, I think that's an issue of fact that should have allowed this to go on. The other issue to point out is a portion of these funds, 97 billion tenge, were actually already on deposit in the bank, earning only 3 percent interest. And what the bank did was they moved those deposits to a term account paying 11 percent interest. So, you know, these were not deposits that were made to help the bank. And it's clear from the record that the deposits were made in the interest of SWIFT because the SK fund was concerned that it would bankrupt itself when it had to repay the SK bonds in 2024. Now, turning to the disaggregation of loss that was raised, the appellants treat this case as a typical fraud on the market case. That's simply not the case here. I'm unaware of any Second Circuit authority that requires disaggregation in an inefficient market case. And so what we did was we pointed the court to Naveen, which is a Ninth Circuit case, and dealing with an inefficient market. And what Naveen recognizes is that the factual predicates for loss causation fall into less rigid patterns when you can't perform an event study, when the market isn't such that it's reacting to every announcement. And is it the case, though, I mean, even if this is a circumstance where an event study is not conceivable, that you don't have to show any, you don't have to present anything to show to which factors, in fact, were causing this loss? Well, I think what Naveen says, and they address that point directly, they say that the defendant has to show that they, that the misrepresented or omitted facts were the very facts that were a substantial factor in causing the economic loss. And so in this case, I submit the record supports that. The omission concerning the SCA deposit, the misrepresentations concerning capital adequacy and going concern directly materialized and caused the loss. They were agreed to these ratios. They needed a second restructure. But it's not the case, though, that there weren't other factors in the environment, what was going on with the banks in general? Those did not have an impact as well? Well, I think, first, I think that that's a fact issue for the jury to determine. I think under Winstar, this court has held that whether there are other intervening factors are a fact issue. And again, I think this is a unique situation in that we don't have an efficient market. So I think you have to look back and see what Dora says. And what Dora says is loss causation is simply a causal connection between the material misrepresentation and the loss. And so if you're if you're applying, I'm not I'm not suggesting that there's a completely different standard for inefficient market cases. But what I'm suggesting is that you have to take into account that the ability to disaggregate in a way that you wouldn't have fraud in the market case just isn't possible in a inefficient market case because you don't have that data. So I believe that to the extent that appellees claim that there were other things. And keep in mind, as well, that regardless of what other things were happening at the time after the 2010 restructuring, the expert testimony is clear that the bank was insolvent, had negative equity from day one. So all those other things may have been cumulative. But what our expert concludes is that the negative carry swap and the S.K. deposit is what caused this to begin with. Unless there are further questions, I'll. Thank you both. Very nicely argued.